## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESEE
## NASHVILLE DIVISION

| | |
|---|---|
| Becky Kirk, Perry Ayoob, and Dawn Karzenoski, as representatives of a class of similarly situated persons, and on behalf of the CHS/Community Health Systems, Inc. Retirement Savings Plan,<br><br>                    Plaintiffs,<br><br>v.<br><br>Retirement Committee of CHS/Community Health Systems, Inc., CHS/Community Health Systems, Inc., John and Jane Does 1-20, Principal Life Insurance Company, Principal Management Corporation, and Principal Global Investors, LLC,<br><br>                    Defendants. | Case No. _____<br><br><br>**COMPLAINT**<br><br>**CLASS ACTION** |

### NATURE OF THE ACTION

1.     Plaintiffs Becky Kirk, Perry Ayoob, and Dawn Karzenoski ("Plaintiffs"), as representatives of the Class described herein and on behalf of the CHS/Community Health Systems, Inc. Retirement Savings Plan ("Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against CHS/Community Health Systems, Inc. ("CHS"), the Retirement Committee of CHS/Community Health Systems, Inc. ("Retirement Committee"), John and Jane Does 1-20,[1] Principal Life Insurance Company, Principal Management Corporation, and Principal Global

---

[1] CHS, the Retirement Committee, and John and Jane Does 1-20 are referred to collectively as "the CHS Defendants" in this Complaint.

Investors, LLC[2] (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties through their disloyal and imprudent management of the Plan and its investments, to the detriment of participants. Plaintiffs bring this action to recover the losses caused by Defendants' fiduciary breaches, disgorge the profits earned by Principal as a result of these breaches, prevent further mismanagement of the Plan and its investments, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      As of the end of 2018, Americans had approximately $7.5 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $29.1 Trillion in First Quarter 2019* (June 19, 2019), *available at* https://www.ici.org/research/stats/retirement/ret_19_q1. These plans are the primary retirement savings vehicle for many Americans, replacing defined benefit plans—commonly referred to as "pension plans"—predominant in previous generations. *See* DEP'T OF LABOR, *Private Pension Plans Bulletin, at 1-3* (Feb. 2018), *available at* https://www.dol.gov/sites/default/files/ebsa/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2015.pdf.

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439

---

[2] Principal Life Insurance Company, Principal Management Corporation, and Principal Global Investors, LLC are referred to collectively as "Principal" in this Complaint.

(1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments.

4.      In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no financial incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the employee.

5.      To protect workers from mismanagement of their hard-earned retirement assets, ERISA imposes strict duties of loyalty and prudence upon fiduciaries who manage retirement plans or retirement plan assets.  These fiduciary duties are "the highest known to the law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), and exercise "care, skill, prudence, and diligence" in carrying out their fiduciary functions. 29 U.S.C. § 1104(a)(1)(B).

6.      Both CHS, as plan sponsor, and the Retirement Committee, as plan administrator, were subject to these fiduciary duties with respect to the Plan. The CHS Defendants breached these fiduciary duties by maintaining excessively expensive and poorly performing index funds in the Plan that were managed by Principal.[3]

7.      The marketplace for index funds is highly competitive, with several companies offering index fund products that track benchmark indices with a high degree of precision, while

---

[3] Index funds are passively-managed investment portfolios that market track indexes such as the Standard & Poor's 500 Index ("S&P 500 Index").

charging very low fees. However, the CHS Defendants did not give any serious consideration to these competitive index fund offerings in the marketplace, and instead used Principal's proprietary index funds, despite fees that were several times higher than marketplace alternatives that tracked the ***exact same index***. Not only were the Principal index funds far more expensive, they were also of significantly lower quality. Compared to marketplace alternatives, Principal's index funds deviated further from the benchmark index, and consistently had the worst performance even on a pre-fee basis. Given the high fees and history of poor performance of Principal's index funds, a prudent fiduciary acting in the best interests of the Plan's participants would have removed these index funds from the Plan and replaced them with more competitive marketplace alternatives. The CHS Defendants' failure to do so has cost participants millions of dollars in excessive fees and lost investment returns.

8.    In addition, the CHS Defendants failed to properly monitor Principal, and failed to appropriately address its conflicts of interest in managing the Plan's target date funds ("TDFs").[4] Because these TDFs are organized as separate accounts for the Plan,[5] Principal owes fiduciary duties to the Plan and its participants with respect to the management of those accounts. Contrary to its fiduciary duties, Principal engaged in self-serving conduct that harmed Plan participants, and the CHS Defendants have failed to address these fiduciary breaches or take any remedial action.

---

[4] A target date fund is a diversified investment with an investment mix that becomes more conservative as the fund's target (retirement) date approaches. Target date funds are generally offered as a suite of funds with target dates staggered 5 to 10 years apart, allowing the participant to choose the target date that aligns with his or her estimated retirement date.

[5] Separate accounts are pooled investment vehicles maintained by a bank or trust company available exclusively to retirement plan customers. A separate account is managed and operated in accordance with an investment management agreement.

9.     In managing the TDF separate account portfolios, Principal selected and retained its own proprietary funds as underlying investments, including high-cost Principal index funds that were problematic for the reasons described above. This was imprudent and disloyal. *See Nelsen v. Principal Global Investors Tr. Co.*, 362 F. Supp. 3d 627, 638 (S.D. Iowa 2019) (reaching same conclusion in connection with Principal's management of TDFs organized as collective trusts).

10.    In addition, Principal retained higher-fee versions of other underlying proprietary investments in the TDF separate accounts to increase its own fee revenue, at the expense of Plan participants. For example, as of 2017, the lowest-cost share class for Principal's mutual funds are R6 shares. Yet, Principal consistently used Institutional shares for the mutual funds held by the TDF separate accounts despite the availability of less expensive R6 shares. As another example, Principal utilized the mutual fund version of the MidCap Growth III, SmallCap Value II, and SmallCap Growth I funds as underlying investments in the TDF separate accounts, even though identical annuity subaccount versions of these funds were available with fees that were 20 to 30 percent lower. In yet another instance, Principal used the mutual fund version of the Diversified Real Asset fund, even though a CIT versions of this fund with lower fees was available, and was used by Principal as an underlying investment in other target-date products it managed. These actions also were imprudent and disloyal, and give rise to a claim for breach of fiduciary duty. *See Nelsen*, 362 F. Supp. 3d at 638-39 (discussing Principal's failure to utilize lease expensive investment vehicles and share classes).

11.    Given Principal's conflicts of interest, the CHS Defendants should have closely scrutinized Principal's choice of investments for the TDF separate accounts and its management of those accounts. Moreover, the CHS Defendants should have been especially cognizant of the

problems associated with the Principal index funds in the TDF separate accounts, given that the CHS Defendants included those index funds as standalone funds in that Plan. Yet, the CHS Defendants took no action to address Principal's mismanagement of the TDF separate accounts and left those separate accounts undisturbed in the Plan. This was imprudent and improperly placed Principal's interests ahead of Plan participants.

12.    Based on this conduct, Plaintiffs assert a claim against all Defendants for breach of their fiduciary duties of loyalty and prudence (Count 1), and assert a claim against the CHS Defendants for failing to properly monitor other fiduciaries (Count 2).

## JURISDICTION AND VENUE

13.    Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties under ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

14.    This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

15.    Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants CHS and the Retirement Committee are located and may be found.  In addition, Principal also does business in this District and may be found in this District.

## THE PARTIES

### PLAINTIFFS

16.    Plaintiff Becky Kirk ("Kirk") resides in Hobbs, New Mexico, and is a former participant in the Plan. Through the Plan, Kirk invested in the Principal Retirement Target 2025 separate account. Through her investment in that separate account, Kirk was invested in imprudent Principal-affiliated index funds, and other investments for which Defendants failed to obtain the lowest-cost vehicle or share class. Kirk has been injured by Defendants' unlawful conduct.  Had Defendants prudently and loyally managed the Plan's investments and the Principal separate accounts, Kirk would have had more assets in her Plan account at the time it was distributed than what she received. Furthermore, Principal has been unjustly enriched as a result of Kirk's investment in the Principal separate accounts.

17.    Plaintiff Perry Ayoob ("Ayoob") resides in Charleston, West Virginia, and is a former participant in the Plan. Through the Plan, Ayoob invested in the Principal Retirement Target 2045 separate account. Through his investment in that separate account, Ayoob was invested in imprudent Principal-affiliated index funds, and other investments for which Defendants failed to obtain the lowest-cost vehicle or share class. Ayoob has been injured by Defendants' unlawful conduct. Had Defendants prudently and loyally managed the Plan's investments and the Principal separate accounts, Ayoob would have had more assets in his plan account at the time it was distributed than what he received. Furthermore, Principal has been unjustly enriched as a result of Ayoob's investment in the Principal separate accounts.

18.    Plaintiff Dawn Karzenoski ("Karzenoski") resides in Dunmore, Pennsylvania and is a former participant in the Plan. Through the Plan, Karzenoski was invested in the Principal Retirement Target 2045 separate account. Through her investment in that separate account,

7

Karzenoski was invested in imprudent Principal-affiliated index funds, and other investments for which Defendants failed to obtain the lowest-cost vehicle or share class. Karzenoski has been injured by Defendants' unlawful conduct. Had Defendants prudently and loyally managed the Plan's investments and the Principal separate accounts, Karzenoski would have had more assets in her plan account at the time it was distributed than what she received. Furthermore, Principal has been unjustly enriched as a result of Karzenoski's investment in the Principal separate accounts.

## THE PLAN

19.   The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

20.   The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to as a "401(k) plan."

21.   The Plan covers substantially all salaried employees of CHS, as well as former employees who elect to remain in the Plan following the conclusion of their employment.

22.   The Plan allows employees to invest a percentage of their earnings on a pre-tax basis. Under the Plan, employees may defer up to 50% of their compensation on a pre-tax basis (subject to annual contribution limits), and CHS matches those contributions at a uniform percentage determined each year by the Retirement Committee.

23.   In directing the investment of these contributions, participants may select from (and are limited to) a lineup of options offered by the Plan. *See* Investment Company Institute, A Close Look at 401(k) Plans, at 9 (Dec. 2015), *available at* https://www.ici.org/pdf/ppr_15_dcplan_profile_401k.pdf (hereinafter "ICI Study"). As a result,

the investment lineup determined by the Plan's fiduciaries is critical to participants' investment results and ultimately the retirement benefits they receive.

**DEFENDANTS**

***CHS***

24.     CHS is headquartered in Franklin, Tennessee. CHS is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and it has ultimate decision-making authority with respect to the management and administration of the Plan and the Plan's investments.  Because CHS exercises discretionary authority or discretionary control with respect to management of the Plan, as well as discretionary authority and responsibility with respect to the administration of the Plan, it is a fiduciary under 29 U.S.C. § 1002(21)(A).

25.     CHS is also a fiduciary because it has authority to "appoint and remove" the members of the Retirement Committee "as it deems necessary for the proper administration of the Plan to ensure that the Plan is being operated for the exclusive benefit of the Participants and their Beneficiaries in accordance with the terms" of ERISA. Plan Document § 2.1(a), 2.2. It is well-accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Stockwell v. Hamilton*, 163 F. Supp. 3d 484, 490-91 (E.D. Mich. 2016) (citing *Liss v. Smith*, 991 F. Supp. 278, 310 (S.D.N.Y. 1998)).  Further, the responsibility for appointing and removing members of the Committee carried with it an accompanying duty to monitor the appointed fiduciaries, to ensure that they were complying with the terms of the Plan and ERISA's statutory standards. 29 C.F.R. § 2509.75-8 (FR-17).

*The Retirement Committee*

26.    The Retirement Committee is identified as the Plan Administrator in the Plan's Form 5500s filed with the United States Department of Labor. Therefore, the Retirement Committee is a fiduciary by virtue of its position in regard to the administration of the Plan. *See* 29 C.F.R. § 2509.75-8 at D-3. The Retirement Committee is also named by the Plan as one of the parties responsible for administering and managing the Plan, and therefore is a named fiduciary pursuant to 29 U.S.C. § 1102(a). *See* Plan Document § 2.2.

27.    The Notes to Financial Statements included in the Plan's Form 5500s state that the Retirement Committee "controls and manages the operation and administration of the Plan." In addition, the Retirement Committee is authorized to establish procedures "regarding the permissible investment options" in the Plan. Plan Document § 4.14(b). Pursuant to these authorized duties and functions, the Retirement Committee and its members exercise discretionary control respecting management of the Plan, exercise authority or control respecting management or disposition of Plan assets, and have discretionary authority or responsibility in administration of the Plan. The Retirement Committee and its members are therefore also functional fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21)(A).

28.    Defendants John and Jane Does 1-20 (the "Doe Defendants") are members of the Retirement Committee, or were members of the Retirement Committee during the class period. The identities of the Doe Defendants are not currently known to Plaintiffs.

*Principal Life Insurance Company*

29.    Principal Life Insurance Company is headquartered in Des Moines, Iowa. Principal is the investment manager for the TDF separate accounts in the Plan and the underlying proprietary investments in those separate accounts. Through its management of the Plan's TDF

separate accounts, Principal Life Insurance Company is an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21).

### Principal Global Investors, LLC

30.    Defendant Principal Global Investors, LLC ("PGI") is a registered investment adviser, and served as the investment sub-adviser of the Principal separate accounts in the Plan from approximately January 2017 to the present, subject to the supervision and review of Principal Life Insurance Company. In that capacity, PGI makes investment allocation decisions and selects the underlying fund options to include in the Principal separate accounts in the Plan. PGI is a Delaware corporation, but at all relevant times was located in Des Moines, Iowa. Through its management of the Plan's TDF separate accounts, PGI is an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21).

### Principal Management Corporation

31.    Defendant Principal Management Corporation ("PMC") is a registered investment adviser and served as the investment sub-adviser of the Principal separate accounts in the Plan from their inception until approximately the end of 2016, subject to the supervision and review of Principal Life Insurance Company. In that capacity, PMC made investment allocation decisions and selected the underlying fund options to include in the Principal separate accounts in the Plan. PMC is an Iowa corporation, and at all relevant times was located in Des Moines, Iowa. Through its management of the Plan's TDF separate accounts, PMC is an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21).

## LEGAL AND FACTUAL BACKGROUND

### ERISA FIDUCIARY DUTIES

32.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries

of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the
> participants and beneficiaries and—
>
> > (A)    for the exclusive purpose of:
> > > (i) providing benefits to participants and their beneficiaries; and
> > > (ii) defraying reasonable expenses of administering the plan;
> >
> > (B)    with the care, skill, prudence, and diligence under the circumstances then
> > prevailing that a prudent man acting in a like capacity and familiar with
> > such matters would use in the conduct of an enterprise of like character
> > and with like aims . . . .

33.     These fiduciary duties are "the highest known to the law." *Chao*, 285 F.3d at 426

***Duty of Prudence***

34.     As reflected above, ERISA § 404(a)(1)(B) "imposes a 'prudent person' standard

by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third

Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). This duty of

prudence under ERISA includes "a continuing duty to monitor [retirement plan] investments and

remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise

prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an

investment is inappropriate, the plan fiduciary "must dispose of it within a reasonable time." *Id.*

(quotation omitted). Fiduciaries therefore may be held liable for either imprudent selection of

investments or for failing to monitor a plan's investments to ensure that each remains prudent.

*Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 383 (6th Cir. 2015) (citing *Tibble* 135 S.Ct. 1823,

1828–29.

12

35.    The duty of prudence also includes a duty to minimize investment expenses. Indeed, "[c]ost-conscious management is fundamental to prudence in the investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (quoting Restatement (Third) of Trusts § 90 cmt. b (2007)).  Thus, selecting and retaining higher-cost investments constitutes a breach of fiduciary duty when similar or identical lower-cost investments are available. *See Braden v. Wal-Mart Stores, Inc,*, 588 F.3d 585, 596 (8th Cir. 2009).

36.    Likewise, where a named fiduciary has delegated investment decisions to one or more investment managers, the responsibility for determining whether their actions are prudent rests with the named fiduciary. *Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets Under the "Prudence" Rule*, 44 Fed. Reg. 37221-02 (1979).

**Duty of Loyalty**

37.    The duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with an "eye single" to the interests of such participants and beneficiaries. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988).

38.    Therefore, a plan fiduciary cannot, consistent with the duty of loyalty, take into account its own business interests when making investment or administrative decisions concerning the plan or its investments. "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA

commands undivided loyalty to the plan participants." *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

### *Source and Construction of Duties*

39.     The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828; *see also James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002). Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble*, 135 S. Ct. at 1828.

40.     In considering whether a fiduciary has breached its duties, courts consider both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction." *Chao*, 285 F.3d at 426 (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)). Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." *Chao*, 285 F.3d at 437 (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)).

### SEPARATE ACCOUNTS

41.     A separate account is an investment vehicle maintained by a bank or trust company that is available exclusively to qualified retirement plans exempt from federal income tax, including 401(k) plans and certain government plans.

42.     Like a mutual fund, a separate account is a pooled investment fund managed by an investment professional according to a defined investment objective. Separate accounts can hold a wide range of securities, including stocks, bonds, options, exchange-traded funds, mutual funds, annuity subaccounts, and even other pooled investment funds. A separate account utilizes a unitized structure, with each share, or unit, representing a proportionate, undivided interest in

the separate account that shares proportionately in the income, profits, and losses experienced by the entire pool of assets within the separate account.

43.    Separate accounts generally have an investment minimum of several million dollars. Furthermore, most separate accounts are available at a lower cost the larger the investment that is made. Thus, separate accounts are particularly suitable for large, institutional investors like the Plan.

44.    Separate accounts provide similar features to mutual funds including daily valuation, automated daily processing, fact sheets, standardized performance and expense disclosures. These features are often contractual—each investor in a separate account has a contractual relationship with the investment manager—and will often provide the same protections in contract form that mutual fund investors are provided by the '40 Act.

45.    While separate accounts have many of the same features of mutual funds, unlike mutual funds, separate accounts are not covered by the Investment Company Act of 1940, and are not subject to the SEC registration, regulatory, and oversight requirements of the '40 Act.

46.    Separate accounts also differ from mutual funds in another critical respect. Under ERISA, mutual fund managers are excluded from the definition of a "fiduciary", such that an ERISA plan's investment in a mutual fund registered under the Investment Company Act of 1940 "shall not by itself cause such investment company or such investment company's investment adviser . . . to be deemed to be a fiduciary . . . ." 29 U.S.C. § 1002(21)(B).  However, no such exception exists for the managers of separate accounts. Therefore, the investment manager of a separate account is an ERISA fiduciary to the extent that the assets of an ERISA-covered plan are invested in the separate account. DOL Advisory Opinion 2005-09A (May 11, 2005) (explaining that the manager of a separate account is "a fiduciary for ERISA-covered

plans     that     invest"     in     its     separate     accounts),     available     at

https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions/2005-

09a.  As the 1974 ERISA Conference Committee Report explained, "banks, trust companies, and

insurance companies [that] maintain pooled investment funds for plans . . . are, of course, plan

fiduciaries" who must manage the funds "for the exclusive benefit of participants and

beneficiaries." H.R. Report 93-1280, 93rd Congress, 2nd. Sess., at 316, 1974 WL 324168, at *61

(1974).[6] Thus, the fiduciary duties described above apply not only to the persons and entities

responsible for managing retirement plans (e.g., CHS and the Retirement Committee), but also to

the persons and entities responsible for managing separate accounts in which retirement assts are

invested (e.g., Principal).

### TARGET DATE FUNDS AND THE FUND-OF-FUNDS STRUCTURE

47.     A target date fund invests in a diversified mix of asset classes managed towards a

particular target (retirement) date, or the approximate date when the investor expects to start

withdrawing money from the fund. For example, the Principal Target 2030 Separate Account is

designed for an investor who expects to retire around 2030. As the target date approaches, the

investment mix becomes more conservative, typically by shifting away from stock investments

towards more conservative fixed income investments. However, target date funds are not limited

to traditional stocks and bonds, and often use asset classes such as commodities, real estate,

inflation-linked bonds, or emerging markets stocks. A target date fund's asset allocation over the

---

[6] The SEC concurs, explaining that "any person who exercises authority or control respecting the management or disposition of the underlying assets of the ... separate account and anyone providing investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the plan" who is "subject to all of the duties and liabilities imposed upon plan fiduciaries" by ERISA. Securities and Exchange Commission Division of Investment Management, Staff Guidance and Studies, 1992 WL 12623680, at *96 (1992).

lifespan of the investment is called its "glide path." Investment companies offer target date funds as a suite, meaning that they offer funds with an array of target dates staggered either 5 or 10 years apart, along with an "income" or "retirement" fund for investors who have already retired.

48.    To accomplish the target asset allocation and diversification across numerous asset classes, the vast majority of target-date funds use a "fund-of-funds" structure, in which the target-date fund invests its assets in other pooled investment products. For target-date mutual funds, these pooled investment products typically include other mutual funds or exchange-traded funds. For target-date separate accounts, the pooled investment product holdings often include collective investment trusts, annuity subaccounts, mutual funds, and exchange-traded funds.

### MARKETPLACE FOR INDEX FUNDS IN RETIREMENT PLAN INVESTMENTS

49.    An index fund is a passively-managed, pooled investment product designed to mirror the performance of a particular benchmark index.  For example, S&P 500 index funds aim to track the Standard & Poor's 500 Index, a market capitalization-weighted index of the 500 largest publicly-traded companies in the United States. The marketplace for index funds has evolved such that for asset classes such as large cap stocks, small cap stocks, foreign stocks, and domestic bonds, there are generally dozens of different products available that track a benchmark index that tracks the particular asset class. These products are not limited to the best-known index associated with the asset class. For example, not only are there numerous products that track the S&P 500, there are also numerous products that track the Russell 1000, another index that tracks large-cap domestic stocks. Regardless of the benchmark index that an investor wants to track, there will generally be several products in the marketplace from which to choose.

50.    The marketplace for index funds is highly competitive, with several companies offering index fund products that track benchmark indices with a high degree of precision, while charging very low fees.

51.    The competitiveness of the marketplace for index funds is particularly acute within the retirement plan segment, given that retirement plans have the unique ability (because of their size) to invest in pooled investment vehicles such as separate accounts, which generally have lower expenses than comparable mutual funds.

52.    Over the past ten years, multiple investment management companies have distinguished themselves in the marketplace by offering highly competitive index fund products based on several competitive advantages: a high degree of institutional expertise at indexing, sophisticated trading platforms that minimize trading costs, and a large asset base that provides economies of scale. As a result, these companies—which include BlackRock, BNY Mellon, Northern Trust, State Street, and Vanguard—have captured a very large percentage of market share of passively-managed assets among large plans and investors in the retirement plan segment.[7]

53.    Though the marketplace for index funds is very competitive, that does not mean that the offerings are uniformly competitive. Some index funds charge fees that are 5, 10, or even 20 times higher than those charged by another fund tracking the exact same index. Furthermore, a higher level of fees does not in any way correspond to a higher quality product or higher level

---

[7] BlackRock, BNY Mellon, Northern Trust, State Street and Vanguard all market their index fund products to other, unaffiliated managers. *See Terraza v. Safeway*, No. 3:16-cv-03994-JST, Dkt. No. 84-19 (N.D. Cal. June 22, 2017) (report from Aon Hewitt reviewing available marketplace offerings for Safeway plan, listing BlackRock, Vanguard, State Street, Northern Trust, and BNY Mellon as the "top 5 index managers").

of services. On the contrary, the least expensive offerings often have the lowest level of tracking error, meaning that they track the index with the highest level of precision.

54.   A prudent fiduciary primarily considers three interrelated factors when choosing which index fund to use to track the chosen index. The first factor is cost. Because an index fund, all things being equal, will produce returns equal to the performance of its benchmark index minus the fees charged by the index fund, fees are a significant determinant of index fund performance.[8]

55.   The second factor is tracking error, which measures how far the index fund's return has historically deviated from the return of the benchmark index.[9] Any type of tracking error (whether positive or negative) is deemed undesirable because either type of variance demonstrates that the index fund's investments did not produce a return that mirrored that of the index, which is the fund's objective. However, prudent fiduciaries pay particular attention to

---

[8] *See* Wilshire Associates Report to Los Angeles City Employees' Retirement System, at 7 (June 26, 2012) (assigning 75% weight to "fees" criteria in search for index fund managers), available at https://www.lacers.org/aboutlacers/board/BoardDocs/2012/Board/20120626/ITEM%20IV-C%20%20INVESTMENTS%20-%20SELECTION%20OF%20INVESTMENT%20MANAGERS%20FOR%20MULTIPLE%20PASSIVE%20INVESTMENT%20MANDATES.pdf (last accessed July 15, 2019) (hereinafter "Wilshire Index Fund Report"); Russel Kinnel, *Fund Fees Predict Future Success or Failure*, at 1 (summarizing multiple studies showing that fees are primary determinant of performance), available at http://www.morningstar.com/articles/752485/fund-fees-predict-future-success-or-failure.html (last accessed July 15, 2019); Jim Mitchell, *Investors Should Choose Index Funds with the Lowest Fees*, TheStreet (Mar. 10, 2015), available at https://www.thestreet.com/story/13072023/1/investors-should-choose-index-funds-with-the-lowest-fees.html (last accessed July 15, 2019).
[9] Los Angeles Deferred Compensation Plan Board Minutes from February 6, 2015 meeting, at 2–3 (summarizing Mercer Investment Consulting passive manager search), available at http://per.lacity.org/deferredcomp/BoardReport15-10PassiveSearchRecommendations.pdf (last accessed July 15, 2019); Wilshire Index Fund Report at 7 (assigning 25% weight to "tracking error" criteria in passive manager search).

negative tracking error, meaning index fund performance that trails the underlying index.[10]

Prudent fiduciaries pay particular attention to negative tracking error because while some sources of tracking error relate to tracking failure, and can result in either outperformance or underperformance, some causes of tracking error—cash drag, inefficient trading systems, and illiquidity—have a generally negative effect on performance.[11] Because chronically negative performance is worse than merely random performance, prudent fiduciaries will seek to avoid index funds that consistently underperform their index on a pre-fee basis, as it will tend to indicate a manager plagued by cash drag, inefficient trading, or illiquidity. Further, because issues with trading efficiency, cash drag, and illiquidity all relate to the amount of assets within the index fund and the skill of the managers, they tend to replicate over time, and thus are often predictive of future underperformance.

56.     The third factor that prudent fiduciaries will consider in evaluating an index fund are institutional experience and assets under management. As explained by EnnisKnupp, the investment consultant to Illinois' State Universities Retirement System, "Years of indexing experience and passive assets under management are important metrics to review when looking at passive managers. Firms with large amounts of passive assets under management are able to leverage their size and scale to more closely track the benchmark. In addition, firms that have multiple indexed products tend to show more commitment (e.g., engage in a greater effort to

---

[10] *See, e.g.*, Mercer Index Fund Report at 27–31 (tracking historical performance separate from tracking error).
[11] BlackRock Index Fund Presentation to Los Angeles City Employees' Retirement System, at 21 (Aug. 8, 2017), available at
http://www.lacers.org/aboutlacers/board/BoardDocs/2017/Investment/2017-08-08/IV%20-%20Presentation%20Blackrock%20re%20Multi%20Passive%20Index%20Portfolios.pdf (last accessed July 15, 2019) (hereinafter "BlackRock Index Fund Report")

minimize trading costs) than firms for which indexing is a small part of their business."[12] Thus, in assessing a particular index strategy, a prudent fiduciary will look at each manager's experience managing the particular strategy and the amount of assets managed according to that strategy.[13]

57.    Taken together, in reviewing index fund managers, a prudent fiduciary will look at fees, tracking error, performance history, the manager's experience, and the manager's assets under management with the particular strategy and more broadly within the asset class.[14]

58.    Further, given the competitiveness of the index fund marketplace, and the rapid evolution of available index fund products, prudent managers of large investment portfolios that include index fund holdings will closely monitor the cost and performance of the index funds in their portfolio, while regularly comparing that cost and performance to the fund's closest competitors, making changes when warranted based on the fees, tracking error, and institutional quality of available products.

### INVESTMENT VEHICLES

59.    There are a number of different vehicles that pool the money of investors, and centrally manage that money according to a particular investment objective. Examples include mutual funds, exchange-traded funds, collective investment trusts, and annuity subaccounts.

60.    These vehicles may differ in terms of their legal structure, regulatory oversight, and product features. However, these vehicles do not inherently differ in terms of their

---

[12] Hewitt EnnisKnupp Report to Illinois State Universities Retirement System Board of Trustees at 3 (May 27, 2010) (hereinafter "Hewitt Index Fund Report").
[13] Hewitt Index Fund Report at 4–5.
[14] *See* Hewitt Index Fund Report at 2–8; Mercer Index Fund Report at 2, 5–18; Wilshire Index Fund Report at 2, 5–8

underlying investments. It is quite common for investment management companies to offer multiple versions of the same investment strategy in different vehicles. For example, BlackRock offers its S&P 500 index strategy as a mutual fund, annuity subaccount, exchange traded fund, and collective investment trust, while Fidelity offers its Contrafund investment as a mutual fund, an annuity subaccount, and a collective investment trust.  These strategies typically invest in identical portfolios of investments, with the only differences being features such as fees and investment minimums that relate to the particular vehicle.

61.     In managing and monitoring an institutional investment portfolio (such as a Plan investment lineup or a fund of funds within that lineup), a prudent fiduciary must determine not only which investments are appropriate for the portfolio, but also determine whether those investments are available in multiple vehicles, and which of those vehicles will best serve the interests of investors.

62.     Due to high asset minimums and exemption from regulations like the '40 Act, separate account fund-of-fund managers typically have the widest array of choices available, allowing them to select other collective investment trusts, mutual funds, separately-managed accounts, annuity subaccounts, and exchange-traded funds as underlying investments.

63.     Given this flexibility, it is relatively uncommon for separate account fund-of-funds to own mutual funds. That is because the compliance requirements of the '40 Act generally result in mutual funds having the highest level of costs among the various vehicles. Furthermore, separate account managers are sufficiently sophisticated that they do not require '40 Act disclosures such as a prospectus or semiannual report of holdings. In addition, the mutual fund structure of an underlying fund in a fund-of-funds separate account is of marginal relevance, because such investors lack standing to personally enforce '40 Act provisions. *See Amer. Chem.*

*& Equip. Inc. 401(k) Retirement Plan v. Principal Mgmt. Corp.*, 864 F.3d 859, 865 (8th Cir. 2017). In contrast, using CITs, annuity subaccounts, and separately-managed accounts as underlying funds offers significantly enhanced protections to both the fund-of-funds and its investors, because the managers of CITs, annuity subaccounts, and separately-managed accounts are all ERISA fiduciaries whenever the monies invested with them are from ERISA plans. Finally, features such as daily liquidity, daily valuation (sometimes referred to as "mark-to-market"), and holdings transparency can be provided by annuity subaccounts as well as collective investment trusts.[15]

64.     Because investment strategies from a particular manager are often available in different vehicles, a prudent fiduciary will investigate the availability of different vehicles implementing the same strategy. And where those vehicles offer virtually identical investment portfolios, prudent fiduciaries will use the vehicle that charges the lowest costs, as that vehicle will generally provide the best performance for investors in the fund-of-funds.

## SHARE CLASSES

65.     Choosing the appropriate investment vehicle does not end an investment fiduciary's task. The investment fiduciary must further consider which share class of the investment vehicle to use.

66.     Mutual funds, annuity subaccounts, and collective investment trusts often offer multiple classes of shares of the same investment that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost share classes are targeted at institutional investors with more assets.

---

[15] *See* Coalition of Collective Investment Trusts, *Collective Investment Trusts White Paper* (Mar. 2015) at 8, 10.

67.     There is no difference between share classes other than the cost—the different share classes of a particular vehicle hold identical investments.  Accordingly, a prudent fiduciary managing or monitoring a fund-of-funds will use its assets and negotiating power to utilize the cheapest share class available. The fiduciary will likewise pull its money from any investment manager that fails to make available the lowest-cost share class, if that share class is being made available to other investors with lower or similar amounts of assets. Finally, a prudent fiduciary will engage in routine monitoring to determine whether a lower-cost share class of any investment has become available, and transfer to that lower-cost share class whenever it would be in the interest of participants.

## DEFENDANTS' VIOLATIONS OF ERISA

**I.     THE CHS DEFENDANTS RETAINED HIGH COST, POORLY-PERFORMING PRINCIPAL INDEX FUNDS AS PLAN INVESTMENT OPTIONS, TO THE DETRIMENT OF PARTICIPANTS**

68.     As discussed above, the marketplace for index funds is highly competitive, with several companies offering index fund products that track benchmark indices with a high degree of precision, while charging very low fees. There were numerous investment managers in the marketplace, including BlackRock, BNY Mellon, Northern Trust, State Street, and Vanguard, that throughout the relevant period offered products tracking the S&P 500, Mid Cap S&P 400 Index, and/or Small Cap S&P 600 indexes with a high degree of precision, while charging very low fees.

69.     The CHS Defendants failed to adequately investigate these marketplace alternatives in selecting and retaining funds for the Plan that tracked these indexes, choosing instead to offer Principal's excessively expensive and poorly performing index fund products as standalone investment options in the Plan. The CHS Defendants selected and retained Principal's

index funds despite the fact that they charged fees that were 3 to 6 times higher than the fees charged by more competitive options. For example, the Retirement Committee selected and retained the Principal Large Cap S&P 500 Index to track the S&P 500 Index at a cost of 6 basis points ("bps"), while numerous other investment managers offered funds tracking the exact same index for only 1 bps.

70.    Not only were the Principal index funds more expensive, they were of significantly lower quality than other options when it came to their sole function—tracking the underlying index. For the past decade or more, Principal's index funds have consistently had among the highest rates of tracking error among all index fund managers.[16] Furthermore, this tracking error has been consistently negative, meaning that Principal index funds are among the worst performing index funds in the entire marketplace even on a *pre-fee* basis.[17]

71.    Institutional factors also demonstrate the superiority of passive managers other than Principal. Vanguard, State Street, Northern Trust, and BlackRock have been managing index fund investments for over 40 years; each company manages over $300 billion in indexed assets (with BlackRock, State Street, and Vanguard managing over $1 trillion in passive investments); and each company offers over 100 different passive investment strategies.[18] By comparison, Principal manages under $50 billion in index fund assets, has been managing index

---

[16] *See* Mercer Investment Consulting, *Manager Search Report to City of Los Angeles*, at 15–16, 30–31, 44, 60, 62 (Jan. 2015), available at http://per.lacity.org/deferredcomp/BR15-10ATTACHMENTCityOfLA-PassiveSearchesFinal.pdf (hereinafter "Mercer Index Fund Report").

[17] Mercer Index Fund Report at 12–13, 27–28, 32, 41, 46, 56, 62.

[18] Hewitt Index Fund Report at 2–5; Mercer Index Fund Report at 10, 25; BlackRock Index Fund Report at 27, 45.

fund investments for a shorter period of time, and offers only five index fund strategies to its clients.

72.     As noted, the CHS Defendants retained as standalone investment options for the Plan several Principal index fund products, including the Principal Large Cap S&P 500 Index, Mid Cap S&P 400 Index, and Small Cap S&P 600 Index fund products. These investment options were retained by the CHS Defendants even though a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries of other 401(k) plans, would have revealed superior alternatives with lower fees and tracking error.

73.     The retention of the Principal index fund products as standalone investment options was imprudent. As an example of the CHS Defendants' failure to prudently investigate index fund options, below is a performance chart covering the years 2013 through 2018 for the S&P 500 Index itself, the Principal Large Cap S&P 500 Index Fund offered as a standalone investment in the Plan, and several other S&P 500 index fund products offered in the retirement plan marketplace, along with the average over/under performance during those years. Other columns show the average annual tracking error during the time period, and the annual fee for each product as of December 31, 2017.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Avg Over/Under Performance 2010-2018 | Avg Tracking Error 2010-2018 | Fee[19] |
|---|---|---|---|---|---|---|---|---|---|
| S&P 500 Index | 32.39 | 13.69 | 1.38 | 11.96 | 21.83 | -4.38 | | | n/a |
| Principal Large Cap S&P 500 Index Sep Acct-I5 | 32.23 -.16 | 13.52 -.17 | 1.33 -.05 | 11.88 -.08 | 21.72 -.11 | -4.43 -.05 | -.09%/yr | 9.1 bps | .06% |
| Blackrock Equity Index NL F | 32.35 -.04 | 13.68 -.01 | 1.38 0 | 11.97 +.01 | 21.83 0 | -4.39 -.01 | 0 | 1.8 bps | .01% |
| State Street S&P 500 Index NL – Cl A | 32.42 +.03 | 13.66 -.03 | 1.39 +.01 | 11.97 +.01 | 21.84 +.01 | -4.40 -.02 | +.01%/yr | 2.2 bps | .01% |
| Northern Trust S&P 500 Index Fund – NL – Tier J | 32.35 -.04 | 13.67 -.02 | 1.38 0 | 11.96 0 | 21.82 -.01 | -4.41 -.03 | -.01%/yr | 1.3 bps | .01% |
| Vanguard Institutional Index (VIIIX) | 32.37 -.02 | 13.68 -.01 | 1.39 +.01 | 11.95 -.01 | 21.82 -.01 | -4.41 -.03 | -.01%/yr | 1.2 bp | .02% |

74.    The chart shows that year after year, the Principal S&P 500 index fund significantly underperformed compared to both its benchmark index and index fund competitors in the marketplace. The chart further shows that the Principal fund had the highest level of tracking error during this eight-year period and the highest fees. Had the CHS Defendants been monitoring the performance and fees of the Principal index funds in the Plan and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly-situated fiduciaries, there was ample evidence during every year of the relevant period that the Principal option should have been replaced with one of the more competitive alternatives

---

[19] As of December 31, 2017.

in the marketplace such as those listed above, all of which were available to the CHS Defendants in the share class listed.

75.    The underperformance of Principal's S&P 500 index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of S&P 500 index tracking. As of September 2014, Principal managed less than $20 billion of assets in S&P 500 index products, while Northern Trust, BlackRock, State Street, and Vanguard all managed between $138 and $400 billion in products tracking the S&P 500.  Additionally, these four companies have all been managing S&P 500 index-tracking products since the late 1970s, while Principal did not launch an S&P 500 index-tracking strategy until 2000.

76.    As another example, the CHS Defendants retained the Principal MidCap S&P 400 Index Fund to track the S&P Midcap 400 despite the availability of marketplace options with superior long-term performance on a pre-fee basis, lower tracking error, and lower fees.  Below is a chart showing the annual performance from 2013 to 2017 of the S&P Midcap 400 Index itself, the Principal MidCap S&P 400 Index Fund offered as a standalone investment option in the Plan, and several index fund products that track the S&P Midcap 400 Index and were used by the fiduciaries of other plans. The chart also shows the average tracking error of each product during this period as well as each product's annual fee as of December 31, 2017.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Avg Over/Under Performance 2010-2018 | Avg Tracking Error 2010-2018 | Annual Fee[20] |
|---|---|---|---|---|---|---|---|---|---|
| S&P MidCap 400 Index | 33.50 | 9.77 | -2.18 | 20.74 | 16.24 | -11.08 | | | n/a |
| Principal MidCap S&P 400 Index Sep Acct-I5 | 33.32 <br> -.18 | 9.65 <br> -.12 | -2.25 <br> -.07 | 20.59 <br> -.15 | 16.14 <br> -.10 | -11.18 <br> -.10 | -.12%/yr | 12.1 bps | .06% |
| Blackrock Mid-Cap Equity Index NL F | 33.49 <br> -.01 | 9.74 <br> -.03 | -2.16 <br> +.02 | 20.70 <br> -.04 | 16.20 <br> -.04 | -11.07 <br> +.01 | -.03%/yr | 3.9 bps | .02% |
| State Street S&P MidCap Index NL – Cl A | 33.48 <br> -.02 | 9.77 <br> 0 | -2.20 <br> -.02 | 20.71 <br> -.03 | 16.25 <br> +.01 | -11.09 <br> -.01 | -.01%/yr | 1.9 bps | .02% |
| Northern Trust S&P MidCap 400 Index Fund – NL – Tier J | 33.36 <br> -.14 | 9.72 <br> -.05 | -2.17 <br> +.01 | 20.70 <br> -.04 | 16.17 <br> -.07 | -11.14 <br> -.06 | -.08%/yr | 7.8 bps | .02% |

77.    The chart shows that year after year, the Principal midcap index fund significantly underperformed both its benchmark index and its index fund competitors in the marketplace. The chart further shows that the Principal fund had the highest level of tracking error as well as the highest fees among these options. Had the CHS Defendants been monitoring the performance of these index funds and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries of 401(k) plans, they would have replaced the Principal mid-cap index option with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to the CHS Defendants in the share class listed above.

---

[20] As of December 31, 2017.

78.     The underperformance of Principal's mid cap index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of S&P Midcap 400 index tracking. BlackRock, Northern Trust, and State Street all had several years more experience with mid-cap indexing than Principal. According to data from Morningstar, as of the end of 2017, Principal managed $3.5 billion in assets tracking the S&P MidCap 400 Index (excluding monies invested by collective investment trusts managed by Principal itself), while Northern Trust, BlackRock, and State Street all managed between $5 and $22 billion in products tracking the same index.[21]

79.     Had the CHS Defendants been monitoring the performance of the Principal index funds and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly-situated fiduciaries, they would have replaced the Principal mid cap index fund with a less expensive, better performing alternative.

80.     The CHS Defendants' retention of Principal's proprietary small cap index product was similarly imprudent. While few investment managers offer a product that tracks the S&P SmallCap 600 Index, Vanguard began offering such a fund in 2010, and as the chart below shows, it would have been a superior option for participants.

---

[21] BlackRock and State Street, in particular, stand out as having achieved superior economies of scale to Principal. As of the end of 2017, both BlackRock and State Street both managed over $15 billion in assets tracking this index.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Avg Over/Under Performance 2011-2018 | Avg Tracking Error 2011-2018 | Annual Fee[22] |
|---|---|---|---|---|---|---|---|---|---|
| S&P SmallCap 600 Index | 41.31 | 5.76 | -1.97 | 26.56 | 13.23 | -8.48 | n/a | n/a | n/a |
| Principal SmallCap S&P 600 Index Sep Acct-I5 | 41.07 -.24 | 5.74 -.02 | -2.10 -.13 | 26.44 -.12 | 13.25 +.02 | -8.62 -.14 | -.12%/yr | 10.9 bps | .06% |
| Vanguard S&P Small-Cap 600 Index (VSMSX) | 41.18 -.13 | 5.69 -.07 | -2.00 -.03 | 26.52 -.04 | 13.37 +.14 | -8.52 -.04 | -.04%/yr | 6.6 bps | .08% |

81.    The chart shows that year after year, the Principal small cap index option significantly underperformed the Vanguard index fund competitor. The chart further shows that the Principal option had higher tracking error, and that the tracking error was chronically negative. Institutional factors also favored Vanguard, given its experience and expertise in index tracking, and given that Vanguard managed at least twenty times more small-cap index tracking assets as of the end of 2017. Had the CHS Defendants been monitoring the performance of the Principal index funds and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly-situated fiduciaries, they would have replaced the Principal small cap index option with the corresponding Vanguard option or another comparable option.

82.    The fact that Principal's index fund options were annuity subaccounts while the marketplace alternatives were collective investment trusts or mutual funds is not a material distinction. Though the legal structure of the Principal index funds is that of an annuity

---

[22] As of December 31, 2017.

subaccount, the investments themselves did not offer any actual insurance-like features. Defendants used an annuity subaccount vehicle because that happens to be the index fund vehicle that Principal offers in the marketplace, not because use of that vehicle conferred any benefit upon Plan participants compared with using an index fund operated as a collective investment trust or mutual fund. This is demonstrated by the fact that Defendants also used proprietary mutual fund vehicles as holdings within the Principal separate accounts.

## II.    INVESTMENT STRUCTURE OF PRINCIPAL SEPARATE ACCOUNTS

83.    The Plan's investment lineup also includes a series of TDF separate accounts managed by Principal (referred to herein as the "Principal separate accounts" or "TDF separate accounts"), established in 2014 for the Plan.

84.    As of the end of 2017, the Principal separate accounts consisted of twelve trusts: eleven options with a target date ranging from 2010 to 2060 (2010, 2015, 2020, etc.), and a "Retirement Strategic Income" fund designed for individuals who are currently retired.

85.    Each of the Principal separate accounts is operated with all investors' assets pooled together. Each investor owns a certain number of units, with each unit representing a proportionate undivided interest in the Principal separate account. The value of each unit is determined by the total market value of the assets held by the Principal separate account divided by the number of existing units.

86.    The Principal separate accounts have, since their inception, used a fund-of-funds investment structure in which the assets of the Principal separate accounts are invested in other pooled investment vehicles.

87.    In managing the Principal separate accounts, Principal first determined which asset classes would make up the separate accounts. Second, Principal determined the percentage

allocations to each asset class throughout the applicable investment lifespan, known as the glide path. Third, Principal constructed each Principal separate account's investment portfolio, which involved the selection and monitoring of the target date funds' underlying investment options and investment managers.

88.    Principal's fiduciary breaches in this case relate entirely to this third step—the selection and monitoring of the Principal separate accounts' underlying investment options.  As detailed below, Principal breached its fiduciary duties of prudence and loyalty by selecting and retaining underlying proprietary investments (and investment vehicles) that increased its own compensation and fees, to the detriment of participants.

### III.    PRINCIPAL INVESTED THE ASSETS OF THE PRINCIPAL SEPARATE ACCOUNTS IN HIGH COST, POORLY-PERFORMING PROPRIETARY INDEX FUNDS IN ITS OWN SELF-INTEREST

89.    Since their inception, the Principal separate accounts have used index funds tracking the Standard & Poor's 500 Index and the Bloomberg Barclays Aggregate Bond Index as part of the separate account portfolio, for purposes of providing exposure to large cap stocks and bonds. At all relevant times, the Principal separate accounts have all had between 35 to 50 percent of their total assets invested in these index funds.

90.    In managing the Plan's TDF separate accounts, Principal failed to consider marketplace alternatives to index funds offered by Principal itself, and instead chose to further its own self-interest by using its own proprietary index fund products to track the two indexes. Further, Principal retained its proprietary index funds despite the fact that they charged fees that were far higher than the fees charged by more competitive options.

91.    Principal's conduct runs contrary to that of other fiduciaries that manage target date pooled investment vehicles. The fiduciaries of target-date investments managed by other

financial services companies including (among others) AllianceBernstein, Charles Schwab, Great-West, and JPMorgan all used leading index fund pooled investment vehicles managed by BlackRock, BNY Mellon, Northern Trust, and State Street within their target-date funds. This is despite the fact that AllianceBernstein, Charles Schwab, Great-West, JPMorgan and Voya all offered their own index fund products in the general marketplace. In contrast, not a single target-date fund in the marketplace (other than those affiliated with Principal) used index funds managed by Principal as underlying investment options.

92.    Moreover, for the reasons described above, institutional factors also weigh against use of Principal index funds, considering their high tracking error, low levels of assets under management, and the relative inexperience of Principal compared to other index fund managers.

93.    Principal's failure to prudently and loyally manage the Principal separate accounts' index fund investments is evident by Principal's selection of the Principal Large Cap S&P 500 Index Fund to track the S&P 500 index, even though it had higher fees and worse performance and tracking error than readily-available marketplace alternatives tracking the exact same index. *See supra* at ¶ 73. Just as it was imprudent for the CHS Defendants to select this fund as a standalone investment option for the Plan given the availability of less expensive and better performing alternatives in the marketplace, it was also imprudent for the Principal to select this fund as an underlying investment of the Principal separate accounts. Further, Principal's use of its own index funds as underlying investments in the Plan's TDF separate accounts was disloyal, as it was driven by conflicts of interest and Principal's business interests, not the best interests of Plan participants.

94.    Principal's disloyal and imprudent index fund management was not limited to the S&P 500 index fund. As noted above, Principal also used a proprietary Principal index fund that

tracked the Bloomberg Barclays U.S. Aggregate Bond Index, despite the fund's historical underperformance, and the availability of several marketplace alternatives that tracked the exact same index with lower tracking error, better historical performance on a pre-fee basis, and fees that were 10 to 15 times lower than the fees charged by Principal.

95.    Below is a performance chart covering the years 2013 through 2017 for the Bloomberg Barclays U.S. Aggregate Bond Index itself, the Principal Bond Market Index Fund, and several other index fund products that track the Bloomberg Barclays U.S. Aggregate Bond Index. The chart also shows the average annual tracking error for each bond index fund product as well as each product's annual fee as of December 31, 2017.

| | 2013 | 2014 | 2015 | 2016 | 2017 | Avg Over/Under Performance 2010-2017 | Avg Tracking Error 2010-2017 | Fee[23] |
|---|---|---|---|---|---|---|---|---|
| Bloomberg Barclays U.S. Aggregate Bond Index | -2.02 | 5.97 | 0.55 | 2.65 | 3.54 | | | n/a |
| Principal Bond Index Sep Acct-Z | -2.45 -.43 | 5.80 -.17 | 0.32 -.23 | 2.34 -.31 | 3.28 -.26 | -.32%/yr | 31.6 bps | .15% |
| Blackrock U.S. Debt Index NL F | -2.02 0 | 6.12 +.15 | 0.57 +.02 | 2.67 +.02 | 3.60 +.06 | +.03%/yr | 3.9 bps | .01% |
| State Street U.S. Bond Index NL – Cl A | -2.05 -.03 | 6.00 +.03 | 0.61 +.06 | 2.62 -.03 | 3.52 0 | 0%/yr | 3 bps | .012% |
| Northern Trust Aggregate Bond Index Fund – NL – Tier J | -2.27 -.25 | 6.08 +.11 | 0.57 +.02 | 2.56 -.09 | 3.49 -.05 | -.01%/yr | 8.3 bps | .013% |

[23] As of December 31, 2017

96.     The chart shows that year after year, the Principal bond index fund significantly underperformed both its benchmark index and index fund competitors in the marketplace. The chart further shows that the Principal fund had the highest level of average tracking error during this seven-year period and the highest level of fees. Had Principal been monitoring the performance of the underlying investments in the Principal separate accounts and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries, it would have replaced the Principal bond index fund with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed above.

97.     The underperformance of Principal's bond index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of passive fixed income management. BlackRock, Northern Trust, State Street, and Vanguard have all been managing passive fixed income assets for over twenty years, while Principal's bond index fund was launched less than 10 years ago.[24] Further, Principal's bond index fund had far less assets under management (excluding monies invested by trusts managed by Principal itself) than comparable products offered by Northern Trust, BlackRock, and State Street, which all managed between $31 and $76 billion in products tracking the same index. Given the superiority of competing bond index fund options, a prudent fiduciary managing the TDF separate accounts would not have retained Principal's bond index fund in those separate accounts.  The fact that Principal retained this fund in the TDF separate accounts further demonstrates that it did not have a prudent and loyal process for managing those separate accounts.

---

[24] Hewitt Index Fund Report at 5; Mercer Index Fund Report at 10.

98.     Principal generated greater fees from the use of proprietary index funds within the TDF separate accounts. In addition, the separate accounts' assets help subsidize the operating costs of Principal's index funds, making them more profitable to Principal.  While this benefitted Principal, it did not benefit the Plan. To the contrary, the use of these proprietary index funds within the TDF separate accounts caused millions of dollars in losses to the Plan and its participants.

99.     Given Principal's conflicts of interest, the CHS Defendants should have carefully reviewed Principal's choice of investments for the TDF separate accounts and its management of those accounts. Moreover, the CHS Defendants should have been aware of the problems associated with the Principal index funds in the TDF separate accounts, given that the CHS Defendants included Principal index funds as standalone funds in that Plan. Yet, the CHS Defendants failed to address Principal's mismanagement of the TDF separate accounts, raised no issues regarding Principal's use of its own index funds, and left the separate accounts in the Plan undisturbed. This was imprudent and improperly placed Principal's interests ahead of Plan participants.

## IV.   PRINCIPAL INVESTED SEPARATE ACCOUNT ASSETS IN INAPPROPRIATE INVESTMENT VEHICLES AND SHARE CLASSES WITH HIGHER COSTS

100.     Principal also breached its fiduciary duties by utilizing more expensive versions of Principal-affiliated underlying investments in the TDF separate accounts, despite the availability of identical, but lower cost, investment vehicles and share classes.

101.     For example, for several years the Principal-managed TDFs have utilized the mutual fund versions of the Principal MidCap Growth III, SmallCap Value II, and SmallCap Growth I funds which, as of the end of 2017, charged annual fees of 0.94%, 0.99% and 1.02%,

respectively. Yet, Principal offered lower cost, but otherwise identical, annuity subaccount versions of these funds that, as of the end of 2017, charged annual fees of 0.64%, 0.77%, and 0.77%.

102.    Additionally, Principal utilized a mutual fund version of the Diversified Real Asset fund within the Principal TDFs, even though a collective investment trust ("CIT") version of this fund was available with lower fees. The mutual fund version of the Diversified Real Asset fund held within the Plan's target date funds charged annual expenses of approximately 0.85%, while the lower-cost CIT version of the exact same fund, with the same underlying investments, charged fees of only 0.64% per year.

103.    Principal also failed to investigate and utilize the lowest-cost share class of many of the investments held by the TDF separate accounts. As of 2017, the lowest-cost share class for Principal's mutual funds are R6 shares. Yet, Principal has continued to use Institutional shares for the mutual funds held by the TDF separate accounts despite the availability of less expensive R6 shares. For example, Defendants utilized Institutional shares of the Principal Real Estate securities mutual fund, with annual expenses of 0.87%, despite the availability of R6 shares, which cost only 0.82% per year.

104.    Similarly, the lowest-cost share class for Principal's annuity subaccount investments is Z shares. However, it appears that Principal used more expensive shares of the Principal Core Plus Bond, International Emerging Markets, Diversified International, Large Cap S&P 500 Index, and International Small Cap annuity subaccounts, despite these shares charging fees that were materially higher than the fees charged by otherwise-identical Z shares.

105.    A prudent fiduciary managing the TDF separate accounts would have utilized the lowest-cost vehicles and share classes available.  The fact that Principal failed to do so further

demonstrates that it did not have a prudent and loyal process for managing the TDF separate accounts.

106.     Principal's use of higher-cost investment vehicles and share classes within the TDF separate accounts resulted in Principal and its affiliates earning higher fees, and also benefitted Principal's mutual fund business, by helping to subsidize the costs of complying with the Investment Company Act of 1940 and providing superior economies of scale. While this benefitted Principal, it did not benefit the Plan.  To the contrary, the use of improper investment vehicles within the separate accounts caused millions of dollars in losses to the Plan and its participants.

107.     Given Principal's conflicts of interest, the CHS Defendants should have carefully reviewed Principal's choice of investments for the TDF separate accounts and its management of those accounts. Moreover, the CHS Defendants should have been aware of the existence and benefits of alternative investment vehicles and share classes, given that the Plan's investment lineup included alternative investment vehicles and inexpensive share classes for other investments. Yet, the CHS Defendants failed to address Principal's mismanagement of the TDF separate accounts, appear to have raised no issues regarding Principal's use of imprudent investment vehicles and share classes, and left the separate accounts in the Plan undisturbed. This was imprudent and improperly placed Principal's interests ahead of those of Plan participants

### PLAINTIFFS LACKED KNOWLEDGE OF MATERIAL FACTS PRIOR TO SUIT

108.     Plaintiffs did not have knowledge of all material facts (including, among other things, the CHS Defendants' process for managing the Plan, Principal's process for managing its separate account TDF investments in the Plan, the availability of less expensive and better

performing alternative investments, the availability of lower-cost investment vehicles and share classes, and the relatively greater experience, expertise, and asset base of Principal's competitors in the index fund marketplace) necessary to understand that Defendants breached their fiduciary duties in violation of ERISA, until shortly before this suit was filed. Indeed, much of this information (including the CHS Defendants' process for managing the Plan, and Principal's investment processes and motivations for selecting, monitoring, and retaining underlying investments in the TDF separate accounts), is solely within Defendants' possession prior to discovery.[25] For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth in this Complaint.

## CLASS ACTION ALLEGATIONS

109. 29 U.S.C. § 1132(a)(2) authorizes any ERISA plan participant or beneficiary to bring an action on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs bring this action derivatively on behalf of the Plan pursuant to this statutory provision, and also seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

110. Plaintiffs assert their claims in Counts I and II on behalf of a class of participants and beneficiaries defined as follows:[26]

---

[25] Prior to bringing suit, Plaintiff Kirk, through counsel, requested certain documents from the Retirement Committee pursuant to 29 U.S.C. § 1024(b)(4), including the investment management agreement under which the Principal separate accounts are managed. The Retirement Committee, through counsel, declined to provide the investment management agreement or certain other documents requested by Plaintiff Kirk.

[26] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

> All participants and beneficiaries of the CHS/Community Health Systems, Inc. Retirement Savings Plan at any time on or after August 8, 2013, excluding members of the Retirement Committee, any other CHS employees with responsibility for the Plan's investment or administrative functions, and members of CHS's Board of Directors.

111. <u>Numerosity</u>:    The Class is so numerous that joinder of all Class members is impracticable. As of the end of 2017, the Plan had over 21,000 participants with account balances.

112. <u>Typicality</u>:    Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and suffered injuries as a result of Defendants' mismanagement of the Plan and its investments. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan and its investments. Defendants' imprudent and disloyal decisions affected all Plan participants similarly.

113. <u>Adequacy</u>:    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

114. <u>Commonality</u>:  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.  Whether Defendants are fiduciaries with respect to the Plan and/or the TDF separate accounts;

    b.  Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

    c.  Whether Defendants are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

    d.  Whether the CHS Defendants breached their duties to monitor other fiduciaries;

    e.  The proper form of equitable and injunctive relief; and

    f.  The proper measure of monetary relief.

115.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

116.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court—such as removal or replacement of particular investments within the Plan or the Principal separate accounts, or removal or replacement of any or all of the fiduciaries of the Plan or the Principal separate accounts—would be dispositive of non-party participants' interests. The accounting and restoration of participants' Plan assets that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

117.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for

the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
**Breach of Duties of Loyalty and Prudence**
**29 U.S.C. § 1104(a)(1)(A)–(B)**

118.    The Retirement Committee and CHS are fiduciaries of the Plan and are subject to ERISA's fiduciary duties with respect to their management of the Plan and the Plan's investments.

119.    Principal is a fiduciary of the TDF separate accounts, and is also subject to ERISA's fiduciary duties with respect to its management of the Plan's assets in those separate accounts.

120.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan, in the selection and monitoring of investments and service providers for the Plan, and in selecting and monitoring the investments held by the TDF separate accounts.

121. Contrary to their fiduciary duties, the CHS Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the investments offered by the Plan. The CHS Defendants imprudently utilized and retained Principal-affiliated index fund options as standalone investments in the Plan despite the availability of identical index fund products offered by unaffiliated managers with demonstrably superior ability to track the subject indices for fees that were substantially lower than those charged by the Principal-affiliated options. This was not in the best interest of Plan participants, and placed the interests of Principal ahead of participants. A prudent and loyal fiduciary employing a prudent process for managing the Plan's investments would not have retained Principal's index funds as standalone investment options in the Plan.

122. A prudent and loyal Plan fiduciary also would have more closely scrutinized the Plan's TDF separate accounts and Principal's conflicts of interest with respect to those separate accounts. Had the CHS Defendants done so, they would have discovered that Principal was managing those separate accounts in a manner designed to benefit Principal rather than the Plan's participants, and would have taken steps to address the problem by replacing the Principal separate accounts with other TDF accounts managed by independent managers, or by demanding that Principal correct its management of those separate accounts. However, the CHS Defendants imprudently failed to take these measures or any other remedial measures, and again placed the interests of Principal ahead of participants.

123. As described throughout this Complaint, Principal failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the underlying investments held by the Principal separate accounts. Principal imprudently and disloyally retained high-cost, poor-performing Principal-affiliated index fund options despite the availability of identical index fund

products offered by unaffiliated managers with demonstrably superior ability to track the subject indices for fees that were far lower than those charged by the Principal-affiliated options. In addition, Principal utilized and retained higher-cost investment vehicles and share classes of Principal-affiliated investments despite the availability of identical investments that charged lower fees and would have performed better.

124.    Each of the above-mentioned actions and failures to act described in paragraphs 121-123 and throughout this Complaint demonstrate Defendants' failure to make investment decisions based solely on the merits of each investment and what was in the best interests of participants invested in the Plan and the Principal separate accounts. Instead, Defendants' conduct and decisions were intended to benefit Principal. Through these actions and omissions, Defendants failed to discharge their fiduciary duties solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

125.    Each of the above actions and omissions described in paragraphs 121-123 and elsewhere in this Complaint also demonstrate that Defendants failed to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

126.    Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good all losses resulting from the aforementioned breaches, and to disgorge any profits earned as a result of such

fiduciary breaches.  In addition, Defendants are subject to equitable and other relief as provided by ERISA.

127.    Each Defendant knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### COUNT II
### Failure to Monitor Fiduciaries
### 29 U.S.C. § 1132

128.    As alleged above, CHS and the Retirement Committee are fiduciaries of the Plan.

129.    CHS is responsible for appointing and removing members of the Retirement Committee. Because CHS had the power to appoint and remove Retirement Committee members, it also had a fiduciary duty to monitor the performance of the Retirement Committee and its members, and to ensure that its appointed fiduciaries were performing their fiduciary obligations in compliance with ERISA. *See Stockwell*, 163 F. Supp. 3d at 490 (citing *Liss*, 991 F. Supp. at 311); *see also* 29 C.F.R. § 2509.75-8, FR-17.

130.    CHS and the Retirement Committee similarly had a fiduciary duty to monitor the performance of any investment managers or other fiduciaries that they retained on behalf of the Plan, and to ensure that they were performing their fiduciary obligations in compliance with ERISA.

131.    CHS breached its fiduciary monitoring duties with respect to the Retirement Committee by, among other things:

a) failing to monitor and evaluate the performance of the Retirement Committee or its members, or have a system in place for doing so, standing idly by as the Plan suffered substantial losses as a result of the imprudent actions and omissions of the Retirement Committee and its members;

b) failing to monitor the Retirement Committee's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

c) failing to remove Retirement Committee members whose performance was inadequate in that they continued to maintain investments that a prudent fiduciary would not have retained in the Plan, to the detriment of the Plan and Plan participants' retirement savings.

132.     CHS and the Retirement Committee breached their fiduciary monitoring duties with respect to Principal by, among other things:

a) failing to monitor and evaluate Principal's performance as a fiduciary investment manager, or have a system in place for doing so, standing idly by as the Plan suffered substantial losses as a result of the imprudent actions and omissions of Principal;

b) failing to monitor the Principal's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

c) failing to properly consider, mitigate, and redress Principal's conflicts of interest; and

d) failing to independently evaluate the Principal separate accounts and Principal as investment manager; and

e) failing to remedy or address Principal's imprudent and disloyal conduct in violation of ERISA as outlined herein, to the detriment of the Plan and Plan participants' retirement savings.

133. Due to the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses due to excessive fees and lost investment earnings.

134. Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), CHS and the Retirement Committee are liable to restore to the Plan all losses suffered as a result of their failure to properly monitor other Plan's fiduciaries. In addition, CHS and the Retirement Committee are subject to equitable and other relief as provided by ERISA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Kirk, Avoob, and Karzenoski, as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A declaration that Defendants have breached their fiduciary duties under ERISA;

D. An order compelling Defendants to personally make good all losses resulting from the breaches of fiduciary duties described above;

E. An accounting for profits earned by Principal and a subsequent order requiring Principal to disgorge all profits earned from, or in respect of, the breaches of fiduciary duties described above;

48

F.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' unlawful practices and to enforce the provisions of ERISA as may be appropriate;

H.      An award of pre-judgment interest;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

J.      An award of such other and further relief as the Court deems equitable and just.


Dated:  August 8, 2019                    **BARRETT JOHNSTON MARTIN & GARRISON, LLC**

<u>s/Jerry Martin</u>
Jerry Martin, TN BPR No. 20193
David Garrison TN BPR No. 24968
Philips Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
jmartin@barrettjohnston.com

**NICHOLS KASTER, PLLP**
Kai H. Richter, MN Bar No. 0296545*
Paul J. Lukas, MN Bar No. 22084X*
Carl F. Engstrom, MN Bar No. 0396298*
Brock J. Specht, MN Bar No. 0388343*
Jacob T. Schutz, MN Bar No. 0395648*
            * *Pro Hac Vice* application forthcoming
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
lukas@nka.com
cengstrom@nka.com
bspecht@nka.com
jschutz@nka.com

*ATTORNEYS FOR PLAINTIFFS*